UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SANDRA CABRAL,<br><br>      Plaintiff,<br><br>      v.<br><br>CAROLYN W. COLVIN,<br>Commissioner,<br>Social Security Administration,<br><br>      Defendant. | Civil Action No.<br>12-11757-FDS |

### MEMORANDUM AND ORDER ON PLAINTIFF'S
### MOTION TO REVERSE AND DEFENDANT'S MOTION FOR
### AN ORDER AFFIRMING THE DECISION OF THE COMMISSIONER

**SAYLOR, J.**

This is an appeal of a final decision of the Commissioner of the Social Security Administration denying the application of plaintiff Sandra Cabral for Social Security Disability Insurance benefits. Plaintiff appeals the Commissioner's denial of her claim on the grounds that the decision is not supported by "substantial evidence" as required by 42 U.S.C. § 405(g). Specifically, she disputes the Commissioner's determination of her residual functional capacity ("RFC"), his determination of her capacity to return to her past relevant work, and his treatment of her subjective complaints of pain on her ability to work.

Plaintiff contends that she is unable to work due to widespread osteoarthritis affecting her knees, lower back, and her right wrist, as well as bilateral carpal tunnel syndrome, a lumbar disc bulge, bilateral thumb degenerative joint disease, left knee degenerative changes, right knee status post meniscal repair surgery, right eye scotoma secondary to retinal artery embolus,

hypertension, patent foramen ovale closure surgery, and diabetes mellitus.

Pending before the Court are plaintiff's motion to reverse or remand the decision of the Commissioner and defendant's motion for an order affirming the decision of the Commissioner. For the reasons stated below, the decision of the Commissioner will be remanded.

**I.     Background**

Plaintiff Sandra Cabral was born on April 27, 1965. She is currently 48 years old. (A.R. at 120). She completed ninth grade, is able to read and write, earned a GED, and has past work experience as a customer service representative, secretary, system analyst, and surgery room set-up person. (A.R. at 42; 138).

**A.     Medical History**[1]

Cabral has complained of hand, knee, and back pain for a number of years. As early as May 3, 1996, she complained of a long-standing history of pain in both knees. (A.R. at 660). In 1996, Dr. James Coleman diagnosed the knee pain as probable early chondromalacia and told her to take Motrin and stretch in order to alleviate the pain. (A.R. at 660). In January 2004, she was seen in a follow-up appointment after an MRI revealed a significant tear of the lateral meniscus. (A.R. at 663). One month later, she underwent surgery on her right knee to repair the tear in her lateral meniscus. (A.R. at 666-67).

On October 29, 2004, an ultrasound was performed on Cabral's bilateral lower extremities. It revealed "normal flow and compression without evidence of deep venous thrombosis." (A.R. at 218). At the time, she was also informed that she suffered from a right

---

[1] The ALJ found, and Cabral does not dispute, that her earnings records show that she acquired sufficient quarters of coverage to remain insured through December 31, 2007 ("the date last insured"). Thus, Cabral must establish disability *on or before* that date in order to be entitled to disability insurance benefits. As a result, this Court, as do the parties in their briefs, largely focuses on the medical evidence up until the date last insured.

eye retinal artery embolus secondary to atrial septal defect/patent foramen ovale.  (A.R. at 216-17, 518-23, 524-34).

On June 20, 2005, while being treated at Truesdale Cardiology, Cabral complained that her hands often went numb and that, below her knees, she felt like she was "80 years old."  (A.R. at 339).  One week later, she underwent patent foramen ovale closure surgery.  (A.R. at 279-82).  At various points in 2005 and 2006, she complained of lightheadedness and palpitations, which doctors indicated may have been related to caffeine or alcohol use.  (A.R. at 308, 337-38).  She also, however, reported a lack of dizziness during that same time period, and into 2007.  (A.R. at 231, 316, 467, 471, 469, 473, 475, 477, 479, 481, 485, 487, 490, 568).

In September 2005, an MRI of Cabral's right wrist showed osteoarthritis at the basal joint of her right thumb.  (A.R. at 267).  She was advised to use over-the-counter anti-inflammatory medication and a thumb stabilizer for treatment.  (A.R. at 264).  A December 22, 2005 record indicates that she continued to experience numbness and tingling in her hands.  (A.R. at 477).  Despite numbness and tingling, she failed to appear for an appointment regarding her hands on December 27, 2005.  (A.R. at 264).

On January 16, 2006, Cabral had an electrodiagnostic consultation with Dr. Douglas Johnson.  (A.R. at 232).  The consultation revealed slowing of the left median sensory distal latency, low back pain, and carpal tunnel syndrome in her left wrist.  (A.R. at 232).  She was informed that she should wear a splint on her wrist as often as possible.  (A.R. at 232).  The examination uncovered a restricted range of motion in her lumbar spine, although there were no abnormal neurological findings.  A test of cervical range of motion, as well as a straight-leg examination, both revealed no abnormalities.  (A.R. at 232, 553).

On February 3, 2006, an MRI performed on Cabral's lumbar spine revealed a mild central disc bulge at L5-S1 with a widely patent canal. (A.R. at 957). She again complained of chronic low back pain on March 13 and May 23, 2006. (A.R. at 479-81).

On March 13, 2006, Cabral reported that she "fe[lt] okay." (A.R. at 479). Subsequent notations through January 2008 indicate normal gait, normal motor strength, normal sensory functions, intact reflexes, and normal coordination. (A.R. at 485-93).

On May 12, 2006, Cabral reported that she "felt well and things were going well." (A.R. at 235). Although she continued to have a small scotoma in her right eye, it had remained unchanged since October 2004. (A.R. at 235). Dr. Magdalena Krzystolik explained to Cabral that "[h]er examination look[ed] quite normal." She was also told that, unless she experienced any changes in her vision, she would not be seen until her annual exam. (A.R. at 235).

Cabral failed to appear for an appointment regarding her hands on August 15, 2006. (A.R. at 264). On August 23, 2007, an MRI performed at the site of pain and swelling on her right hand revealed a small, nonspecific joint effusion involving the MCP joint of the right middle finger. (A.R. at 388). That same month, she reported that she was feeling good with no complaints. (A.R. at 490).

In September 2007, Cabral met with Dr. Kevin Mabie and complained of pain in her left knee that had been ongoing over the prior one to two months. (A.R. at 263). She was told to continue with over-the-counter anti-inflammatories and was sent for an MRI. (A.R. at 363). An October 3, 2007 MRI revealed "extensive loss of hyaline articular cartilage at the patella, prominent joint effusion, [and] mild degenerative changes at the medial and lateral joint compartments." (A.R. at 271-72). She received an injection of Hyalgan to alleviate pain in her

left knee on October 22, 2007, as well as an injection of Synvisc for her left knee on October 29, 2007. (A.R. at 261-62).

On December 20, 2007, Cabral met with Dr. Arnold-Peter Weiss for bilateral hand pain and numbness. (A.R. at 243). She stated that she felt locking and sticking along with pain on her radial side thumb that only increased when pressure was applied to it. (A.R. at 243). She underwent a nerve conduction study at that time. (A.R. at 243-44).

Cabral's medical history reveals that she suffers from hypertension and diabetes mellitus type II. (A.R. at 461, 490-93). Her medical history also shows bouts of fatigue along with reports of no fatigue. (A.R. at 227, 467, 469, 471, 473, 479, 481, 485, 487; A.R. at 231, 293, 316, 475, 477, 490).

### B.     State Agency Opinions

On May 30, 2009, Dr. M.A. Gopal completed a Physical Residual Functional Capacity Assessment of Cabral. (A.R. at 502-509).[2] Dr. Gopal opined that, through December 30, 2007, the date she was last insured, she retained the ability to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk (with normal breaks) for a total of at least two hours in an eight-hour workday, sit (with normal breaks) for a total of about six hours in an eight-hour workday, push and/or pull with her left hand occasionally, grasp and twist with her left hand occasionally, and perform all postural movements occasionally.[3] (A.R.

---

[2] "Residual Functional Capacity" is "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1).

[3] According to the RFC assessment, "occasionally" means occurring cumulatively up to one-third of an eight hour workday, and "frequently" means occurring cumulatively one-third to two-thirds of an eight hour workday. (A.R. at 502). Additionally, postural movements include climbing, balancing, stooping, kneeling, crouching, and crawling.

at 503-506). Dr. Gopal concluded that Cabral could perform sedentary RFC work.[4]

On October 8, 2009, Dr. John Manuelian completed a Physical RFC Assessment of Cabral. (A.R. at 510-17). Dr. Manuelian opined that, through December 30, 2007, Cabral retained the ability to occasionally lift and/or carry ten pounds, frequently lift and/or carry less than ten pounds, stand and/or walk (with normal breaks) for a total of less than two hours in an eight-hour workday, sit (with normal breaks) for a total of about six hours in and eight-hour workday, and occasionally perform all postural activities with the exception of never climbing ladders, ropes, or scaffolds. (A.R. at 511-12). Dr. Manuelian further found that she could perform all manipulative activities with a potential weakened left hand grasp, and was to avoid exposure to extreme cold, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights. (A.R. at 513-14). Dr. Manuelian concluded that she could perform sedentary work. (A.R. at 517).

## C. Treating Physicians' Assessments

On January 4, 2010, Dr. Maryanne Noris completed a cardiac questionnaire, in which she reported that she had been treating Cabral since April 12, 2005. (A.R. at 752, 960). She noted that Cabral had been diagnosed with patent foramen ovale, hypertension, and hypercholesterolemia. (A.R. at 752, 960). Dr. Noris opined that Cabral's cardiac condition caused her to experience significant and/or chronic fatigue and episodes of dizziness and/or lightheadedness. (A.R. at 752, 960). She further opined that Cabral had "occasional side effects from medication," and on April 25, 2011, added to her questionnaire that Cabral's "conditions

---

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). "Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id.*

were the same on or before December 2007." (A.R. at 960).

On January 12, 2010, and again on April 27, 2011, Dr. Kevin Mabie completed a pain questionnaire with Cabral. (A.R. at 753, 953). He stated that she suffered from significant and severe pain caused by osteoarthritis in multiple sites. (A.R. at 753, 953). Dr. Mabie opined that the pain was of such severity as to preclude the sustained concentration and productivity that would be needed for full-time employment on a sustained basis. (A.R. at 753, 953). In his April 27, 2011 opinion, Dr. Mabie wrote that her pain had been at this level of severity on or before December 31, 2007, and "continues to progressively get worse." (A.R. at 953).

### D. Hearing Testimony

Cabral testified at the hearing held on April 28, 2011. (A.R. at 32-67). She stated that she was unable to work because of pain in her hands, knees, and lower back, and that she just "couldn't tolerate it anymore." (A.R. at 43-44). She also testified that due to swelling and constant pain, she was unable to focus and had difficulty standing without her knees buckling. (A.R. at 45-46). She also noted that the pain had become more chronic since 2007. (A.R. at 45-46). She spoke of problems with her shoulder, neck, and heart, and with depression. (A.R. at 45, 47-49). She indicated that she took Motrin and had cortisone injections for the pain in her knees prior to 2007, that she was recently prescribed painkillers, and that she was prescribed splints for her hands prior to 1997 that she has consistently worn. (A.R. at 52-53, 54, 55).

As to her daily activities, Cabral testified, "throughout the whole day I'm usually just laying down or sitting down." (A.R. at 49). She then asserted that she typically spent four hours per day lying down. (A.R. at 50). She testified that her housework was limited to picking up and washing dishes, and that pain and physical limitations prevented her from partaking in her

favorite hobby—cooking—because she was physically incapable of standing for long periods of time, peeling potatoes, and opening jars of tomato sauce.  (A.R. at 50).

Cabral noted that she required extensive assistance from friends and family members to care for her two children.  (A.R. at 55-56).  In the 2006-2007 time frame, she indicated that friends would take her children on "play dates" several times a week, and "one to three times a week [my] girls would be out just with some friends and another day would be with my mother-in-law or the preschool or the summer camps."  (A.R. at 56).

The vocational expert identified Cabral's past relevant work as including the following positions with the following Department of Labor classifications:  customer service representative (sedentary and skilled), 249.262-010 of U.S. Dep't of Labor, Dictionary of Occupational Titles (4th ed. 1991) (DOT) available at 1991 WL 672314 (1991); school secretary (sedentary and skilled), 201.362-030 DOT available at 1991 WL 671672 (1991); surgery room assistant (light and skilled), 079.374-022 DOT available at 1991 WL 646865 (1991); and systems analyst (sedentary and skilled), 030.167-014 DOT available at 1991 WL 646547 (1991).  The vocational expert testified that the sedentary jobs—customer service representative, school secretary, and systems analyst—allowed for the option to sit or stand.  (A.R. at 64).

## II.     Procedural History

Plaintiff filed a Title II application for a period of disability and disability insurance benefits on February 24, 2009.  (A.R. at 118-126).  She claimed an inability to work since October 14, 2004.  (A.R. at 120).  The Social Security Administration denied her initial claim on June 5, 2009, and upon reconsideration on October 8, 2009.  (A.R. at 70-74; 76-78).  She then requested an administrative hearing.  (A.R. at 79-81).  On April 28, 2011, an Administrative Law

Judge held a hearing, at which Cabral and a vocational expert testified. (A.R. at 32-67). Following an unfavorable ALJ decision dated June 23, 2011, she appealed to the Appeals Council, which denied her request for review. (A.R. at 1-3, 12-31). On September 19, 2012, she filed the present action with this Court to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

### III. Analysis

#### A. Standard of Review

Under § 205(g) of the Social Security Act, this Court may affirm, modify, or reverse the Commissioner's decision, with or without remanding the case for a rehearing. 42 U.S.C. § 405(g). The ALJ's finding on any fact shall be conclusive if it is supported by substantial evidence, and must be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion," even if the record could justify a different conclusion. *Rodriguez v. Sec'y of Health and Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981); *see also Evangelista v. Sec'y of Health and Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987). In applying the "substantial evidence" standard, the Court must bear in mind that it is the province of the ALJ, not the courts, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts of evidence. *Ortiz v. Sec'y of Health and Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). Reversal is warranted only if the ALJ committed a legal or factual error in evaluating plaintiff's claim, or if the record contains no "evidence rationally adequate . . . to justify the conclusion" of the ALJ. *Roman-Roman v. Commissioner of Social Security*, 114 Fed. Appx. 410, 411 (1st Cir. 2004); *see also Manso-Pizarro v. Sec'y of Health and Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996).

**B.     Standard for Entitlement to Social Security Disability Insurance Benefits**

In order to qualify for SSDI benefits, a claimant must demonstrate that she is disabled within the meaning of the Social Security Act. The Social Security Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be severe enough to prevent the claimant from performing not only her past work, but any substantial gainful work existing in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 401.1560(c)(1).

An applicant's impairment is evaluated under a five-step analysis set forth in the regulations promulgated under the statute. 20 C.F.R. § 404.1520. The First Circuit has described the analytical sequence as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.
>
> Second, does the claimant have a 'severe impairment' . . . mean[ing] an impairment 'which significantly limits his or her mental capacity to perform basic work-related functions[?]' If the claimant does not have an impairment of at least this degree of severity, he is automatically considered not disabled.
>
> Third, does the claimant have an impairment equivalent to a specific list of impairments contained in Appendix 1 [of the Social Security regulation]? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled . . . . If, however, his ability to perform basic work-related functions is impaired significantly (test 2) but there is no 'Appendix 1' impairment (test 3), the [ALJ] goes on to ask the fourth question:
>
> Fourth, does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.
>
> Fifth, does the claimant's impairment prevent him from performing other work of

the sort found in the economy?  If so, he is disabled; if not, he is not disabled.

*Goodermote v. Sec'y of Health and Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982).

The burden of proof is on the applicant as to the first four inquiries.  *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the [ALJ] may require.").  At the fifth step of the analysis, the burden shifts to the Commissioner to show that the claimant is capable of performing jobs available in the national economy.  *See Goodermote*, 690 F.2d at 7.  In making this determination, the ALJ must assess the claimant's RFC in combination with vocational factors, including the claimant's age, education, and work experience.  20 C.F.R. § 404.1560(c).

C.   **The ALJ's Findings**

In evaluating the evidence, the ALJ conducted the five-part analysis called for by the regulations.  First, the ALJ concluded that plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of October 14, 2004, through December 31, 2007, the date last insured.  (A.R. at 17).  Second, the ALJ determined that plaintiff had the following severe impairments:  (1) lumbar spine disc bulge; (2) bilateral carpal tunnel syndrome; (3) right wrist osteoarthritis; (4) bilateral thumb degenerative joint disease; (5) left knee degenerative charges; (6) right knee meniscal repair surgery; (7) right eye scotoma secondary to retinal artery embolus; (8) hypertension; (9) foramen ovale closure surgery; and (10) diabetes mellitus.  (A.R. at 18).  Third, the ALJ concluded that plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (A.R. at 18).

At the fourth step, the ALJ concluded that plaintiff had the RFC to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a). (A.R. at 19). The ALJ found that she was able to perform her past relevant work as a customer service representative, as that work did not require the performance of activities precluded by her RFC. (A.R. at 22).

### D.     Plaintiff's Objections

Plaintiff contends that the Commissioner committed material legal error in determining her RFC, erred as a matter of law in failing to properly evaluate her subjective complaints of pain on her ability to work, and made a finding, unsupported by substantial evidence, that she had the RFC to return to her past relevant work as a customer service representative.

For the reasons set forth below, plaintiff's motion to reverse the decision of the Commissioner will be granted in part and the matter will be remanded.

#### a.     Subjective Allegations of Pain

Plaintiff's principal challenge is to the ALJ's credibility determination concerning her allegations of pain caused by her impairments. In assessing a claimant's complaints of pain, an ALJ must first find "a clinically determinable medical impairment that can reasonably be expected to produce the pain alleged." *Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 21 (1st Cir. 1986). If a claimant meets that threshold, as plaintiff did here, the ALJ must next evaluate the extent to which "the intensity, persistence, and functionally limiting effects" of the pain would affect the individual's ability to work. *Pires v. Astrue*, 553 F. Supp. 2d 15, 22-23 (D. Mass. 2008) (quoting *Titles II and XVI: Determining Capability To Do Other Work - Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work*, SSR 96-9p, 61 FR 34478-01 (July 2, 1996)). That step requires an appraisal of the credibility of

the claimant's statements concerning his or her symptoms and their functional effects. *Id.*

In assessing a claimant's claims of pain and the effect on his or her ability to work, the ALJ must consider the so-called "*Avery* factors":

> (1) [t]he nature, location, onset, duration, frequency, radiation, and intensity of pain; (2) [p]recipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) [t]ype, dosage, effectiveness, and adverse side-effects of any pain medication; (4) [t]reatment, other than medication, for pain relief; (5) [f]unctional restrictions; and (6) [t]he claimant's daily activities.

*Avery*, 797 F.2d at 29; s*ee also* 20 C.F.R. § 404.1529; *see also* SSR 96-7P. The ALJ must take into account evidence relating to those six factors in judging the credibility of claimants's complaints, identifying specific reasons for disbelieving any of these complaints. *Pires*, 553 F. Supp. 2d at 22-23 (citing SSR 96–7p; *see also Da Rosa v. Sec'y of Health & Human Servs.,* 803 F.2d 24, 26 (1st Cir. 1986) (remanding credibility decision to ALJ and stating that any new credibility finding "must be supported by substantial evidence and the ALJ must make specific findings as to the relevant evidence he considered in determining to disbelieve the appellant"); *Guyton v. Apfel,* 20 F. Supp. 2d 156, 166 (D. Mass. 1998) ("[A] general reference to the record stating that 'Claimant's testimony regarding pain and discomfort is not credible to the extent alleged in light of the evidence of record' . . . does not satisfy the requirement of specific findings for credibility determinations.").

Because pain may be more severe than indicated by the objective medical evidence, relying *solely* on objective medical evidence in determining credibility is not generally appropriate:

> [complaints regarding pain and its functional effects] may not be disregarded solely because they are not substantiated by objective medical evidence . . . . The

> determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

*Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, SSR 96-7P (S.S.A July 2, 1996); *see also* 20 C.F.R. §§ 404.1529(c)(1), 416.929(c); *Nguyen v. Chater,* 172 F.3d 31, 34 (1st Cir. 1999) (per curiam) (citing 20 C.F.R. § 404.1529(c) for the rule that in assessing plaintiff's level of pain, "the ALJ was required to consider evidence *in addition to* medical tests") (emphasis added).

Similarly, in assessing a claimant's credibility, an ALJ should not reject subjective allegations of pain solely because they are inconsistent with the medical record. *Pires*, 553 F. Supp. 2d at 22-23 (D. Mass. 2008); *see also* SSR 96–7p ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence."); *Valiquette v. Astrue,* 498 F. Supp. 2d 424, 433 (D. Mass. 2007) ("[S]ome dissonance between the objective medical assessments and the plaintiff's description of the level of pain he was experiencing . . . merely poses the question of the credibility of his subjective complaints, it does not answer it.").

It is improper for an ALJ to make an RFC determination and then use it to discredit plaintiff's complaints of pain. *See Alberts v. Astrue*, 2013 WL 1331110, at *11 (D. Mass. 2013) (citing *Longerman v. Astrue*, 2011 WL 5190319 (N.D.Ill. 2011), wherein the court observed that "[a]s the Seventh Circuit has made clear, finding statements that support the RFC credible and disregarding statements that do not 'turns the credibility determination process on its head' "

(quoting *Brindisi v. Barnhart*, 315 F.3d 783, 787–88 (7th Cir.2003)); *Smollins v. Astrue*, 2011 WL 3857123 (E.D.N.Y. Sept. 1, 2011) (holding that the ALJ "merely compared [claimant's] statements regarding her symptoms to his own RFC assessment [and thus] failed to follow the dictates of the Social Security regulations in performing his credibility assessment").

Here, the ALJ found that plaintiff's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms [were] not credible to the extent that they [were] inconsistent with the residual functional capacity as set forth above in this finding." (A.R. at 20). Plaintiff contends that the ALJ made a premature determination of her RFC and used this as a "bootstrap to create a *post hoc* determination of credibility." (Pl.'s Reply Mem. at 1). Defendant responds that this language merely serves as a segue into a more detailed discussion of plaintiff's subjective allegations of pain that detailed evidence in the record undermining her credibility. (Def.'s Mem. at 10).

Defendant cites *Alberts v. Astrue*, 2013 WL 1331110 (D. Mass. Mar. 29, 2013) in support of that proposition. *Id.* at *11. The plaintiff in *Alberts* had argued that the "ALJ applied the incorrect legal standard . . . by finding her not credible to the extent her testimony conflicted with a pre-determined [RFC]." *Alberts*, 2013 WL 1331110, at *11. The court there disagreed with the plaintiff, finding that the correct legal standard had been used. *Id.* The ALJ, among other things, had cited testimony that plaintiff "cooked, performed light household tasks, shopped, cared for her dog, read books, watched television and spent time at the clubhouse," noted that she "often went out to eat with family and friends," observed that "medications had been at least partially successful in 'reducing her symptoms,'" and noted that "the record reflected 'a significant gap in the claimant's history of mental health treatment.'" *Alberts*, 2013

WL 1331110, at *13.[5]  The court then concluded that the ALJ identified the relevant legal framework in considering plaintiff's credibility in light of the record.  *Id.*

Here, the ALJ detailed the objective medical evidence, but did not analyze the *Avery* factors, as the ALJ did in *Alberts*.[6]  Defendant concedes that the "ALJ did not discuss [the *Avery*] factors in a detailed fashion."  (Def.'s Mem. at 15).  Defendant contends, however, that the ALJ's consideration of plaintiff's credibility was sufficient because he questioned her about those factors, "he considered how her testimony fit with the rest of the evidence, [] he specifically relied on medical evidence that supported his conclusions," and he cited to exhibits in which plaintiff discussed her activities, limitations, and pain.  Defendant also cites *Belanger v. Barnhart*, 2006 WL 3519307, at * 3 (D. Me. 2006) *(citing Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987)) in support of that conclusion.

Defendant's reliance on *Belanger* and *Frustaglia* is misplaced.  In *Belanger*, the plaintiff contended that where the ALJ did not discuss his daily or subjective allegations of pain, the decision must be reversed.  The court disagreed, because the plaintiff had never identified any hearing testimony that was inconsistent with the ALJ's determination of his RFC.  The court also highlighted the ALJ's reliance on a medical report, as to which the court did "not find any

---

[5] Defendant here notes that "[the ALJ] also identified gaps in the record, during which time there were no significant complaints, treatment, or examination results.  *See Irlanda Ortiz* v. Sec'*y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (viewing gaps in medical treatment as 'evidence' that claimant's pain was not as intense as alleged)."  (Def.'s Mem. at 15).  However, none of the ALJ's statements indicate that he identified such gaps in the record, and defendant cites nothing in his brief that would suggest otherwise.

[6] As to plaintiff's functional restrictions, the ALJ noted that she "reports that pain, hand and knee numbness and weakness, and dizziness, caused significant difficulty with lifting, using her hands for grasping and fine manipulation, sitting, standing, walking, bending, kneeling, squatting, and climbing stairs, as well as performing personal care activities and daily tasks," and that she needed to rest her knees several times per day.  (A.R. at 19). As to her daily activities, the ALJ wrote that she reported that pain, hand and knee numbness and weakness, and dizziness caused significant difficulty when attempting to perform personal care activities and daily tasks. (A.R. at 19).

medical evidence dated after [the] report that contradict[ed] [its] findings." *Belanger*, 2006 WL 3519307, at *2-3.  In contrast, plaintiff here has specifically identified testimony inconsistent with the ALJ's RFC determination.  (Pl.'s Mem. at 6-7).  Moreover, the January 2010 and April 2011 reports filed by treating physicians appear to directly contradict the 2005 and 2006 findings relied on by the ALJ.  (A.R. at 21).

Similarly, in *Frustaglia*, the ALJ considered the plaintiff's testimony as to the limitations imposed by his impairments and pain, and deemed them not credible to the extent alleged.  In making that determination, the ALJ considered the plaintiff's general appearance at the hearing and the lack of significant objective and diagnostic findings to substantiate his complaint.  In reviewing the ALJ's decision, the First Circuit made note of contradictory statements by plaintiff, in addition to the fact that no evidence showed a medically determinable impairment that could have reasonably been expected to produce the alleged impairment (migraine headaches).  The court noted that although "more express findings, regarding head pain and credibility, than those given here are preferable, we have examined the entire record and their adequacy is supported by substantial evidence." *Frustaglia.*, 829 F.2d at 195.  Here, although plaintiff did report "feeling good" in August 2007, the majority of the record suggests otherwise.  (A.R. at 21 Ex. 17F).  Moreover, the ALJ determined that "the claimant's medically determinable impairments could reasonably be expected to have produced some of the alleged symptoms through the date last insured."  (A.R. at 19-20).

Although a factual summary of the *Avery* factors is often sufficient to demonstrate that the ALJ considered those factors, more may be required where the evidence does not clearly support the ALJ's credibility determination. *Pires*, 553 F. Supp. 2d at 24; *compare Frustaglia*, 829 F.2d 192, 194–95 (1st Cir. 1987) (affirming notwithstanding lack of express findings

17

regarding credibility determination where substantial evidence, including inconsistent statements by claimant, supported ALJ's decision); *Rand v. Barnhart,* 357 F. Supp. 2d 361, 367–68 (D. Mass. 2005) (similar) *with Da Rosa v. Sec'y of Health & Human Servs.,* 803 F.2d 24, 26 (1st Cir. 1986) (remanding with instructions that ALJ's credibility determination must be supported by substantial evidence and specific findings); *Waters v. Bowen,* 709 F. Supp. 278, 281–85 (D. Mass. 1989) (reversing ALJ's finding that plaintiff's complaints of pain were not credible where the only cited reason for that finding was objective medical evidence, and expressing skepticism that the *Avery* factors provided substantial evidence to support the ALJ).

Here, there was substantial evidence in support of plaintiff's subjective allegations of pain. Plaintiff told the ALJ that her body was swollen and in constant pain; that she could probably lift no more than a quart of orange juice; that she performed only minimal daily activities; that she needed extensive help in order to care for her children; that medication did not help alleviate the pain; and that even when sitting, she had to elevate her legs in order to prevent her feet from swelling and knees from hurting. (A.R. at 44, 53). In addition, there is no indication that any of her physicians doubted either her claimed disabilities or allegations of pain.

Ultimately, of course, "[i]t is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record." *Ortiz*, 955 F.2d at 769. The ALJ's assessment of a claimant's credibility "is given considerable deference and, accordingly, a reviewing court will rarely disturb it." *Ferreira v. Astrue*, 2012 WL 1085522, *7 (D. Mass. Mar. 29, 2012), (citing *Anderson v. Astrue*, 682 F. Supp. 2d 89, 97 (D. Mass. 2010)). However, where a claimant's testimony is disregarded, "[g]eneral findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's

complaints." *Bazile v. Apfel*, 113 F. Supp. 2d 181, 187 (D. Mass. 2000) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)).

In short, the ALJ was certainly free to conclude that plaintiff's subjective claims of pain were not credible. Nonetheless, under the circumstances presented here, more specificity is required. Because it is unclear how the ALJ came to discredit plaintiff's claims of severe pain, this case will be remanded to the ALJ to address the credibility of plaintiff's claims of pain in light of the *Avery* factors and to make specific findings as to credibility. The ALJ should then, presumably, reassess plaintiff's RFC and issue a decision. *Pires*, 553 F. Supp. 2d at 24; *See Freeman v. Barnhart,* 274 F.3d 606, 609 (1st Cir. 2001) (remand is an appropriate remedy to "allow the Commissioner to fulfill his role of resolving conflicting evidence, a task which is not [the court's] to perform").

### IV. Conclusion

For the foregoing reasons, the defendant's motion for an order to affirm the final decision of the Commissioner of the Social Security Administration is DENIED, and plaintiff's motion for an order to remand the decision of the Commissioner, to the extent consistent with this opinion, is GRANTED. This matter is hereby remanded to the Social Security Administration for further proceedings consistent with this opinion.

**So Ordered.**

/s/ F. Dennis Saylor  
F. Dennis Saylor IV  
United States District Judge

Dated: August 6, 2013